**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**GARRETT BARMORE,**

                    **Plaintiff,**

**-against-**                                                          **04-CV-0445**

**GREGORY J. AIDALA, Superintendent of Guilderland**
**Central School District, ISMAEL VILLAFANE, Principal**
**of Guilderland High School, FLOYD DOUGLAS,**
**Assistant Principal of Guilderland High School, BRIAN**
**MCCANN, Assistant Principal of Guilderland High**
**School, WILLIAM G. BRINKMAN, President of**
**Guilderland Board of Education, GUILDERLAND**
**CENTRAL SCHOOL DISTRICT, GUILDERLAND HIGH**
**SCHOOL and TOWN OF GUILDERLAND BOARD OF**
**EDUCATION,**

                    **Defendants.**
_____

**THOMAS J. McAVOY,**
**Senior United States District Judge**


**DECISION & ORDER**

**I.  INTRODUCTION**

          Plaintiff commenced this action asserting racial discrimination and civil rights claims

pursuant to 42 U.S.C. §§ 1981 & 1983, and supplemental state tort and constitutional violation

claims, for conduct occurring in the Guilderland Central School District. See generally Compl. [doc.

# 1].  The Court previously addressed this case in a decision on Defendants' motion pursuant to

FED. R. CIV. P. 12(c) & 56 and dismissed certain state law claims and all claims against Defendant

1

Brinkman.  See Barmore v. Aidala, 419 F. Supp. 2d 193 (N.D.N.Y. 2005).  Familiarity with this

prior decision is presumed. Presently before the Court is Defendants' second motion for summary

judgment pursuant to FED. R. CIV. P. 56.

## II.  STANDARD OF REVIEW

It is well settled that on a motion for summary judgment, the Court must construe the

evidence in the light most favorable to the non-moving party, see Tenenbaum v. Williams, 193 F.3d

581, 592 (2d Cir. 1999), and may grant summary judgment only where "there is no genuine issue as

to any material fact and ... the moving party is entitled to judgment as a matter of law."  FED. R. CIV.

P. 56(c).  An issue is genuine if the relevant evidence is such that a reasonable jury could return a

verdict for the non-moving party.  Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986).  A party

seeking summary judgment bears the burden of informing the Court of the basis for the motion and

of identifying those portions of the record that the moving party believes demonstrate the absence of

a genuine issue of material fact as to a dispositive issue. Celotex Corp. v. Catrett, 477 U.S. 317, 323

(1986).

If the movant is able to establish a prima facie basis for summary judgment, the burden of

production shifts to the party opposing summary judgment who must produce evidence establishing

the existence of a factual dispute that a reasonable jury could resolve in his favor. Matsushita Elec.

Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  While the Court must view the

evidence in the light most favorable to the non-moving party and draw all reasonable inferences in

his favor, Abramson v. Pataki, 278 F.3d 93, 101 (2d Cir. 2002), a party opposing a properly

supported motion for summary judgment may not rest upon "mere allegations or denials" asserted in

his pleadings, Rexnord Holdings, Inc. v. Bidermann, 21 F.3d 522, 525-26 (2d Cir. 1994), or on

conclusory allegations or unsubstantiated speculation. Scotto v. Almenas, 143 F.3d 105, 114 (2d. Cir. 1998). As one legal treatise has succinctly stated, summary judgment requires the parties to "put up or shut up." Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000)(quoting Fleming James, Jr. & Geoffrey C. Hazard, Jr., Civil Procedure 150 (2d ed. 1977)).

The Local Rules of the Northern District provide a mechanism for the efficient resolution of summary judgment motions. See N.D.N.Y.L.R. 7.1(a)(3). This mechanism places the onus on the parties to marshal the evidence that either supports, or defeats, the motion. Monahan v. New York City Dep't of Corrections, 214 F.3d 275, 291 (2d Cir. 2000)(The Court's Local Rules require the parties "to clarify the elements of the substantive law which remain at issue because they turn on contested facts."). The competing Local Rule 7.1(a)(3) statements are where the parties are to present the evidence that either supports or defeats a motion for summary judgment. Facts that are not in these statements or not supported by specific citations to the record need not be considered. See id. (The Court "is not required to consider what the parties fail to point out.")(internal quotation marks and citations omitted); Amnesty America v. Town of West Hartford, 288 F.3d 467, 470 (2d Cir. 2002)("We agree with those circuits that have held that FED. R. CIV. P. 56 does not impose an obligation on a district court to perform an independent review of the record to find proof of a factual dispute.")(citations omitted). "The record for purposes of the Statement of Material Facts includes the pleadings, depositions, answers to interrogatories, admissions and affidavits. It does not, however, include attorney's affidavits." N.D.N.Y.L.R. 7.1(a)(3). An attorney's affidavit, to the extent it is based upon hearsay, is of no evidentiary value on the motion for summary judgment. See Burlington Coat Factory Warehouse Corp. v. Esprit De Corp., 769 F.2d 919, 924 (2d Cir. 1985)( A party "cannot rely on inadmissible hearsay in opposing a motion for summary judgment ... absent a

3

showing that admissible evidence will be available at trial." )(citations omitted); see also Hollander v. American Cyanamid Co., 172 F.3d 192, 198 (2d Cir. 1999), abrogated on other grounds, Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 148 (2000)( "A court may [ ] strike portions of an affidavit that are not based upon the affiant's personal knowledge, contain inadmissible hearsay or make generalized and conclusory statements." ).

## III. BACKGROUND

Unless indicated otherwise, the following facts are derived from the parties' properly supported and/or properly opposed Statements of Material Facts ("SOMF"),[1] and from the parties' Revised Joint Pretrial Stipulation ("JPS"). See JPS dkt. # 142. Where a dispute exists, the facts are set forth in the light most favorable to Plaintiff.

Plaintiff Garrett Barmore was an eighteen-year-old African-American senior at the Guilderland High School ("GHS") when he commenced this action in April of 2004. As discussed more fully below, this case arises primarily from racially charged incidents by a fellow student that occurred in October of 2003 during Plaintiff's Senior year at GHS (2003-2004), but also includes events that occurred during his Freshmen (2000-2001) and Junior (2002-2003) years at GHS. The Guilderland Central School District ("the District") has had a Racial Harassment Policy in effect since June of 1995, and instituted an Anti-Bullying Policy in June of 2003. JPS ¶¶ 34-38. The Anti-Bullying policy cross- references the Racial Harassment Policy, and both explain the regulations and complaint procedures for conduct that violates the policies. Id. In addition, the District publishes its policies annually in the Student Handbook which is provided to students at the

_____

[1] Where the Court cites to one party's SOMF as supporting a factual proposition, the opposing party has either admitted the fact, or failed to provide a citation to the record where properly supported opposition to that fact can be found.

start of each year, and supplies information on making complaints under these polices in the District's Calendar which is distributed to each student's household each year. Id. ¶¶ 36, 41. Plaintiff received a copy of the 2003-2004 GHS Student Handbook at the beginning of the 2003-2004 academic year. JPS ¶ 8. At least during Plaintiff's last two years at GHS, he was aware of the District's policies against racism, bullying, and harassment by other students. Def. SOMF ¶¶ 10, 53,[2] 71, JPS ¶¶ 8-9. In addition, during Plaintiff's Freshman, Sophomore, and Junior years at GHS, Plaintiff participated in the National Coalition Building Institute ("NCBI") program,[3] and was a member of the School District's Students and Teachers Against Racism ("STAR") program. Def. SOMF ¶ 4, 7. Both programs were designed to combat racism and discrimination at GHS and in the District. Id.; JPS ¶ 5.

Plaintiff contends that while he was a student at GHS, students regularly made racial and religious derogatory statements in the presence of hall monitors, teachers, or bus drivers. Pl. SOMF ¶ 75. However, except for the incidents set forth below, the record does not support that any of these statements were directed at or to Plaintiff, or that he made any formal complaints to school officials regarding racism, harassment or bullying occurring at GHS. See Def. SOMF ¶ 72; Barmore Dep. (Pltf. Ex. 1) p. 80.

In the fall of 2000, during Plaintiff's Freshman year, Plaintiff was subjected to two racially derogatory incidents by two teammates while at football practice. Def. SOMF ¶ 72; Barmore Dep. (Def. Ex. Q) pp. 65-71. Plaintiff reported both incidents to the coaches. The first incident involved

---

[2] During Plaintiff's Sophomore year, he was referred to mediation over an allegation that he called a female student a sexually derogatory name. Def. SOMF ¶ 53. This evidence is relevant only to extent that it demonstrates Plaintiff's knowledge of policies against harassment and the peer mediation procedures at GHS.

[3] Plaintiff became a "trainer" in GHS's NCBI program during his Junior year. JPS ¶ 4.

a racial epithet directed to Plaintiff and two other students by a special education student who was a member of the Freshmen Football Team.  Barmore 50-h Hearing Dep. (Pltf. Ex. 1), pp. 151-154; Spector Aff. ¶¶ 4-5 [dkt. # 86].  While Plaintiff testified that he believed the coach "brush[ed the complaint] under the carpet" because the student had "problems," 50-h Hearing Dep., pp. 152-153, Plaintiff also testified that he did not recall if the coach did anything in response to the complaint. See Barmore Dep. p. 68.  The coach asserted that upon being advised of the incident he reported the incident to the Athletic Director who in turn advised the coach to speak to the parents of both students. Spector Aff. ¶¶ 4-5.  After speaking with the parents, it was determined that the student would be suspended from playing football for a certain period of time as punishment for his statement. Id.  It was the Coach's understanding that Plaintiff's mother believed the punishment to be appropriate. Id. ¶ 5.

The second incident resulted from an altercation between Plaintiff and a Varsity Football Team player that occurred after Plaintiff said something to a Varsity player after the Varsity Football Team lost a game. See Barmore 50-h hearing Trans. p. 149 (not recalling exactly what he said but thought it was something to lift the Varsity player's spirits); Swan Aff. ¶ 4 (contending that Plaintiff was teasing the Varsity player about the loss) .  During the altercation, the Varsity player uttered a racial epithet at, and spit on, Plaintiff. Barmore 50-h hearing Trans. p. 149; Swan Aff. ¶ 4.  The Varsity player was suspended from playing in the following two football games and "the situation was monitored." Swan Aff. ¶ 4; see Barmore Dep. p. 69.  The Varsity student also apologized to Plaintiff in a "mediation" arranged by the coach.  Barmore Dep. pp. 69-70.  Plaintiff played on GHS football teams each of the 4 years of high school. Def. SOMF ¶ 3. The behavior by these two students involved in the two incidents never occurred again.  Def. SOMF ¶ 72.  There is no

indication of other racially-based comments or incidents occurring at football practices or games.

On October 25, 2002, during Plaintiff's Junior year, one of Plaintiff's African-American friends, A.D.,  was involved in a racially-charged incident at GHS with a Caucasian student, J.P.  See Pl. SOMF ¶ 83.  J.P. had a history of racially-charged incidents at GHS that resulted in disciplinary action by GHS and District officials. See id. at ¶¶ 80-85.  On Halloween night 2002, shortly after the in-school incident between J.P. and A.D., Plaintiff and A.D. were walking through a residential section of Guilderland when a vehicle drove past them.  See  Barmore Dep. (Def. Ex. Q)  pp. 45 -57.  J.P., one of the vehicle's occupants, shouted a racial epithet out of the window.  Id.  Even though (a) Plaintiff had never had any unpleasant interactions with J.P. prior to that date, see JPS ¶ 11, (b) the racial epithet was in the singular, see Barmore Dep. p. 50, and (c)  Plaintiff was aware that the A.D. and J.P. had an on-going feud arising from the fact that A.D.'s bother had previously beaten up J.P., see id. at pp. 51-52, Plaintiff believed that the racial epithet was directed at him and A.D.  Id. at p. 50.  Moments later, Plaintiff and A.D. encountered Brian Forte.  Id.  Forte was a Resource Officer at GHS and a Guilderland Police Officer.  Def. SOMF ¶ 43.  Forte knew Plaintiff well because Plaintiff stopped by Forte's office at GHS on almost a daily basis to talk about Plaintiff's interest in becoming a police officer.  Forte Aff. ¶ 3.  At the time that Plaintiff and A.D. encountered Forte, Forte was on patrol as a Guilderland Police Officer.  Barmore Dep. (Def. Ex. Q)  p. 52 -55.  Plaintiff and A.D. reported to Forte what had occurred, and Forte instructed the pair to come to his office at GHS the following school day to fill out a police report. Id.

The following school day, Plaintiff and A.D. met with Forte and filled out a police report.  Id. They also reported the incident to Defendant Floyd Douglas, an Assistant Principal at GHS  Id.  On behalf of GHS, Defendant Brian McCann commenced an investigation regarding the incident.

McCann's investigation included an interview with J. P.   J.P. readily admitted shouting the racial epithet at A.D., but attempted to justify his action by claiming that A.D.'s older brother had previously assaulted him and that A.D. regularly teased him about the assault. McCann Aff., ¶ 5. GHS officials suspended J.P. from school for two months despite the fact that the harassment occurred off of GHS's grounds.  Def. SOMF ¶ 42; McCann Aff. ¶ 5; JPS ¶ 12.  Plaintiff claims to have no knowledge of J.P.'s suspension,[4] but Plaintiff does not recall seeing J.P. at GHS during the two month period following the 2002 Halloween incident.

Approximately one year later, on October 11, 2003, while Plaintiff, A.D., and two other students were walking to the GHS Homecoming Dance and while on GHS property, a vehicle owned by J.P. drove past the group.  The vehicle had two or three occupants.  One of the occupants shouted a racial epithet out of the vehicle's window. Plaintiff assumed that it was J.P. who shouted the racial epithet. Barmore 50-h Hearing Dep., pp. 58-60 (testifying that he did not see J.P. but "assumed" J.P. shouted the epithet because it came from J.P.'s automobile);  Barmore Dep., pp. 161-162 (testifying that he could not identify any of the occupants, but "presumed" that J.P. made the statement because it came from his vehicle).  Plaintiff and A.D. immediately reported the incident to Forte and McCann who were both chaperoning the dance.   Forte and McCann told the two to come to their offices the following school day to file reports.

On the following Monday, Plaintiff and A.D. filed reports with Forte and McCann.  McCann immediately commenced an investigation on behalf of GHS. McCann Aff. ¶ 7.  He interviewed all of the students walking with Plaintiff to the dance, but concluded that none of the students, including

---

[4]Defendants contend that federal privacy laws prohibit them from disclosing to one student the discipline imposed on another student. See Aidala Aff. ¶ 4 [dkt. # 86].

Plaintiff, could positively identify J.P. as the occupant who shouted the racial epithet. Id.  Instead, he found the students to have "conflicting stories" as to what occurred.  Id.; see also Pltf. Ex. 26 (McCann's notes of the investigation).   McCann also interviewed J.P. and another student who admitted to being in the vehicle with J.P. McCann Aff. ¶ 7.   J.P. and this other student denied that any racial epithets were shouted from the vehicle. Id.  Instead, J.P. contended that he was being "set up" by A.D. and that A.D. had been taunting him since the October 2002 incident and his ensuing two month suspension. Id.  McCann deemed the results of the investigation "inconclusive" because no one could positively identify the person who made the statement. Id.  McCann asked Forte to conduct an independent investigation into the incident.  Id.   Forte conducted a similar investigation but also deemed his investigation inconclusive because he also found that none of the students could positively identify the person who shouted the racial epithet.  Forte Aff. ¶ 7.

McCann contends that after his investigation, he spoke to Plaintiff and A.D., advised them of the results of the investigations, and told the two to report to him if they had any additional information or if any other incidents occurred. McCann Aff. ¶ 9.  Plaintiff asserts that McCann talked to him, A.D., and J.P. and told all of them to "cut it out" before someone got hurt, but Plaintiff was "confused" by the admonition because he believed he had done nothing wrong and therefore had nothing to "cut out." See  Barmore 50-h Hear. Trans. p. 103. Forte also contends that after his investigation he spoke to all the students involved and conveyed the message that racial remarks would not be tolerated in school or on school grounds, and advised that if anyone had any additional information, or if any other incidents occurred,  they should report their information to him immediately. Forte Aff. ¶ 7.  Plaintiff disputes that McCann and Forte affirmatively advised him to return with any additional evidence, but there is no dispute that Defendants and other school officials

never refused to communicate with Plaintiff while he was a student at GHS. <u>See</u> Def. SOMF ¶ 28.

On October 29, 2003, while in one of the GHS's cafeterias, J.P. uttered a racial epithet to Plaintiff as the two passed each other. <u>See</u> Barmore 50-h Hear. Trans. p. 107.  Plaintiff confronted J.P. at one of the lunch tables and asked him "what was his deal?" <u>Id.</u>  Another student also confronted J.P. <u>Id.</u> at 108.   Although Plaintiff considered engaging in a physical confrontation with J.P. that day, he chose not to do so "due in part to his fear that doing so would jeopardize his participation in the last interscholastic football contest of the season under the GHS Athletic Code of Conduct." Def. SOMF ¶ 14; <u>see id.</u> ¶ 38 ("On October 29, 2003, Plaintiff confronted [J.P.] in a GHS cafeteria and thought about a physical confrontation, but chose not to fight [J.P.] because he wanted to play in GHS's last interscholastic varsity football game on October 30, 2003.").   The following day, one of Plaintiff's friends told him that he should make a complaint to an administrator regarding J.P's comment but Plaintiff chose not to do so. Def. SOMF ¶ 35; JPS ¶ 26.

On October 31, 2003, Plaintiff saw J.P. in the hallway at least three times without incident. JPS ¶ 49.  Later that day, one of Plaintiff's friends told him that J.P. "threatened that he was going to run [Plaintiff] over with his car that night." Pl. SOMF ¶ 89.  Plaintiff became "enraged" but did not report the threat to anyone at the school. Barmore 50-h Hear. Trans. pp. 116-17.  Instead, based in part upon the erroneous belief that GHS did nothing to J.P. following the Halloween 2002 incident, and because J.P. was not disciplined for the October 11, 2003 Homecoming Dance incident, Plaintiff decided to handle the matter himself. <u>Id.</u>  Plaintiff  proceeded to the cafeteria where he saw J.P. seated at a table facing away from Plaintiff.  Def. SOMF ¶¶ 19; 41, 43.  Plaintiff approached J.P. from behind and slapped him on the head before any verbal communication was given.  Def. SOMF ¶¶ 19; JPS ¶ 15.  A fight ensued during which J.P. shouted a racial epithet at Plaintiff and both

10

students struck blows upon the other. <u>Id.</u> J.P. suffered a broken nose and was knocked to the floor. Barmore 50-h Hearing Dep  (Ex. P) pp. 125-128.  Plaintiff's friend, A.D., then put J.P. in a headlock and Plaintiff walked away and proceeded to Defendant Floyd Douglas' office. <u>Id.</u>  Plaintiff told Douglas that he chose to confront J.P. at school because he thought doing so would lessen his chances of being arrested, Def. SOMF ¶ 31, and that he chose to wait until October 31, 2003 rather than confront him on an earlier date because he wanted to participate in his last interscholastic varsity football game.  <u>Id.</u> ¶ 32; JPS ¶ 25.

As a result of the October 31, 2003 altercation, Plaintiff received the maximum five (5) day suspension from Defendant Ismael Villafane, Principal of GHS , and was referred by Villafane to a Superintendent's Hearing before Defendant Gregory J. Aidala, Superintendent of the Guilderland School District. JPS ¶¶ 19, 51, 53- 54.  Plaintiff concedes that the 5-day suspension issued by Villafane was  appropriate under the circumstances, but argues that further suspension was unwarranted. <u>See</u> JPS ¶ 19.  Villafane recommended to Aidala that Plaintiff be suspended for ten weeks for Plaintiff's role in the October 31, 2003 altercation.  JPS ¶ 52.  After the Superintendent's Hearing, Aidala issued a suspension through the end of November,  which amounted to an additional eleven school days of suspension. JPS ¶ 55. Superintendent Aidala asserts:

> My decision to discipline Plaintiff was not influenced by Mr. Villafane's recommendation. My decision to discipline Plaintiff was based upon the circumstances of Garrett's assault of [J.P.], the specific evidence proffered during Garrett's November hearing, the information I obtained from reading Mr. Wessler's book, "The Respectful School," as well as the input I received from Mr. Wessler.

Aidala Aff. ¶ 6 [dkt. # 86].

 "Plaintiff and his attorney successfully appealed the Superintendent['s] suspension of eleven days so that his student record shows a suspension of five days." JPS ¶ 44. The suspension was not

stayed during the appeal.  JPS ¶ 57.

As a result of the October 31, 2003 altercation, J.P. received a suspension for the rest of the

2003-2004 academic year and never attended any class or extracurricular function at GHS thereafter.

Def. SOMF ¶ 29. As asserted by Superintendent Aidala,

> [J.P.] was one of the most highly suspended students during his Junior and Senior years of
> High School. [J.P.] was suspended for more than half of the two-year period that included his
> Junior and Senior years of school for his verbal, not physical behavior. [J.P.] was disciplined
> for his verbally offensive behavior in a progressive manner based upon his prior history.  As
> [J.P.'s] file indicates, his conflicts with students and classroom disruptions resulted in
> referrals to STAR and NCBI, the school social worker, to detention, followed by out-of-
> school suspensions of increasing length.

Aidala Aff. ¶ 2 [dkt. # 86].

Plaintiff returned to GHS following his suspension, completed his Senior year, and graduated

with his class. There is no indication of harassing behavior by fellow students occurring in the school

after his suspension.[5]  After graduation, Plaintiff attended his "preferred choice of post-secondary

educational institutions he applied to attend." Id. ¶ 65.

Although Plaintiff contends that his suspension "was the most severe punishment defendant

Superintendent had ever handed down for this type of behavior," Compl.  ¶ 24; that white students

received considerably lesser punishments for similar, or even more egregious, behavior, id. ¶ 25; and

that "defendants unlawfully enforced [the] anti-bullying policy when plaintiff, a student of color,

justifiably assaulted [J.P.], but failed to enforce it when [J.P.] illegally assaulted and threatened

plaintiff," id. ¶ 26;  the undisputed facts reveal that:

---

[5] Plaintiff previously implied that before his fight with J.P., he had received threatening e-mails from J.P. and
that the school was aware of these e-mails but did nothing about them. However, the undisputed facts on this motion
indicate that J.P. sent racially derogatory and threatening e-mail and electronic "instant messages" to Plaintiff *only after*
the October 31, 2003 altercation. Def. SOMF ¶¶ 26, 52.

On October 2, 2003, a White student, RW[,] was suspended for five (5) days for making a racial slur directed at an African American student, CDL. The African American student, CDL, engaged in a physical confrontation with the White student, RW, and CDL was suspended for two (2) days. Another White student, S.W. who participated in the incident was suspended for five (5) days.

The following White students were suspended after Superintendent hearings:

J.C.   1 year for writing threatening remarks in the boys['] bathroom;

A.T.   2 months for disruptive behavior, cutting class, fighting, harassment and vandalism;

B.A.   From May 16, 2002 through the remainder of the school year, for stealing items from the boys['] locker room; and

M.O.   15 days for assaulting another student.

Def. SOMF ¶¶ 35 & 36.   Further, as indicated above, J.P. was suspended for two months following the October 31, 2002 incident, and was suspended for eight months following the October 31, 2003 incident.

## IV.  DISCUSSION

### (a).  Race-Based Hostile Educational Environment Claim

The Court will first address Plaintiff's race-based hostile educational environment claims against the individual defendants.[6]   To succeed on these claims, Plaintiff must establish (1) that he was subjected to a racially hostile educational environment, see Davis v. Monroe Co. Bd. of Educ., 526 U.S. 629, 650 (1999)(gender based hostile educational environment); Hayut v. State Univ. of

---

[6] These claims are brought pursuant to 42 U.S.C. §§ 1981 and 1983 and assert violations of the equal protection clauses of the United States and New York State constitutions.  All of these claims are addressed together. See Pinnacle Nursing Home v. Axelrod, 928 F.2d 1306, 1317 (2d Cir. 1991)("The breadth of coverage under the equal protection clauses of the federal and [New York State] constitutions is equal."); see Sanchez v. Turner, 2002 WL 1343754, *11 n. 13 (S.D.N.Y. June 19, 2002); Burka v. New York City Transit Authority, 680 F. Supp. 590, 603 (S.D.N.Y. 1988); Booker v. Board of Educ., Baldwinsville Central, 238 F. Supp.2d 469, 475 (N.D.N.Y. 2002)(Munson, S.J.) ("The § 1981 claim is treated exactly like the § 1983 claim, becomes merged into it and is considered as a single claim.").

New York, 352 F.3d 733, 744-745 (2d Cir. 2003)(gender based claim); and (2) that the defendants were deliberately indifferent to it. See Gant ex rel. Gant v. Wallingford Bd. Of Educ., 195 F.3d 134, 140 (2d Cir. 1999)("[I]n cases of alleged student-on-student harassment, only deliberate indifference to such harassment can be viewed as discrimination by school officials themselves.").

To establish that there existed  a racially hostile educational environment, Plaintiff must prove that the environment was permeated with racial hostility of such severity or pervasiveness so as to significantly alter the conditions of his educational environment and thereby deny him equal access to the school's resources and opportunities. See Davis, 526 U.S. at 650 ; Hayut, 352 F.3d at 744-745.  This standard requires an environment that is both objectively and subjectively hostile. Hayut, 352 F.3d at 744-746.  "Making a 'hostility' determination in the educational context, as in the employment context, entails examining the totality of the circumstances, including: 'the frequency of the discriminatory conduct;  its severity;  whether it is physically threatening or humiliating, or a mere offensive utterance;  and whether it unreasonably interferes with' the victim's academic performance." Id. at 745 (quoting  Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 1993)).

Assuming that Plaintiff found his educational environment to be abusive or hostile, it is doubtful that a reasonable fact finder could conclude on the evidence before the Court that Plaintiff encountered an objectively hostile or abusive educational environment.  Despite evidence that racial and religious epithets were regularly uttered in the halls and on the buses of the school district, there is no evidence that they were heard by Plaintiff.  See Barmore Dep.  (Pltf. Ex. 1)  p. 80 (testifying that he does not recall any racial statements made by fellow students other than set forth above). Rather, Plaintiff's unfortunate involvement with racism at GHS involved two incidents in his Freshmen year while at football practice, one in his Junior year while off of school grounds, and the

14

incidents during his Senior year at the Homecoming Dance and in the three days following the

school's investigation into the Homecoming Dance incident.  While these events constitute offensive

and unacceptable behavior by students, they hardly amount to an educational environment permeated

by race based harassment, or of such severity that it would have impeded a reasonable student in

Plaintiff's shoes from accessing the educational opportunities provided at GHS. See Hayut, 352 F.3d

at 745  ("Finding the harassment 'pervasive' means that the challenged incidents are 'more than

episodic;  they must be sufficiently continuous and concerted.'")(quoting Carrero v. New York City

Hous. Auth., 890 F.2d 569, 577 (2d Cir. 1989)).  Moreover, there is no indication that Plaintiff

impeded in any manner from accessing any educational opportunity or even suffered in his studies

save for the time he was suspended.  On this last issue, the impediment, if there was one, came from

Plaintiff's own actions and decisions, not from the environment that he confronted at GHS.[7]

Nevertheless, assuming *arguendo* that a reasonable fact finder could find that Plaintiff was

confronted by an actionable race-based hostile educational environment, the claims fail because no

reasonable fact finder could conclude that any of the individual defendants were deliberately

indifferent to it.  Deliberate indifference is a state of mind that Plaintiff may establish by

demonstrating that school officials were made aware of the hostile environment, but chose to do

nothing about it.  See Gant, 195 F.3d at 140.  "[D]eliberate indifference can be found when the

defendant's response to known discrimination 'is clearly unreasonable in light of the known

---

[7]In this regard, Plaintiff admitted that he determined to attack J.P. at school to lessen his chances of being arrested, that he contemplated physically confronting him on September 29, 2003 in the cafeteria but determined to wait until after October 30, 2003 so that he could play his last varsity football game. Given that Plaintiff had decided to physically attack J.P. before October 30, 2003, no reasonable fact finder could conclude that the October 31, 2003 rumor that J.P. was intending to run him over with his car was the cause of the October 31, 2003 confrontation.  While the threat of being run over might have accelerated his plan to physically confront J.P. , his admissions to school officials immediately after the attack indicate unequivocally that the plan was concocted before the threat was conveyed to him.

circumstances.'" Gant, 195 F.3d at 140 (quoting Davis, 526 U.S. at 648). Where a plaintiff asserts that school officials failed to appropriately discipline the student perpetrating the harassment, the Court must give substantial deference to school administrator's determinations. Davis, 526 U.S. at 648 (Courts must "refrain from second-guessing the disciplinary decisions made by school administrators."). The standard is not one of mere reasonableness that "transforms every school disciplinary decision into a jury question." Yap v. Oceanside Union Free Sch. Dist., 303 F. Supp.2d 284, 294 (E.D.N.Y. 2004). As the Second Circuit explained:

> The ultimate inquiry, of course, is one of discriminatory purpose on the part of the defendant himself. Thus, ... a plaintiff must show that the defendant's indifference was such that the defendant intended the discrimination to occur.

Gant, 195 F.3d at 140.

Here, the undisputed facts reveal that each time Plaintiff brought his complaints of racial harassment to the attention of school administrators, an investigation was conducted and, when presented by facts establishing racial harassment, punishment was meted out. While Plaintiff may not have like the results that were reached, especially with regard to 2003 Homecoming Dance incident, and while Defendants' actions may not have stopped the harassment, that is not the determinative issue. "[T]he ultimate failure of [school official's measures to end the harassment by other students] does mean that Plaintiffs have created a jury question with regard to deliberate indifference." See Yap, 303 F. Supp.2d at 294 (citing Crispim v. Athanson, 275 F. Supp.2d 240, 248 (D. Conn. 2003)(granting summary judgment in spite of an argument that the school's remedial and preventative measures proved insufficient)). Instead, Plaintiff must establish that Defendants' actions were so clearly unreasonable that a fact finder could draw the inference that Defendants wanted the discrimination to continue. On this record, no reasonable fact finder could conclude draw

16

that inference. See Gant, 195 F. 3d at 140.

Equally unavailing is Plaintiff's argument that Defendants were deliberately indifferent because they "should have known" that harassment was on-going but did nothing about it. As the Second Circuit held in Gant:

> It would be inappropriate to base a finding of discriminatory intent on a defendant's failure to respond to circumstances that were not actually known to him, even if he reasonably should have known. The Supreme Court has rejected the use of such an objective ("should have known") test for deliberate indifference in the Title IX context, see Davis, 119 S.Ct. at 1671; [Gebser v. Lago Vista Indep. School District, 524 U.S. 274, 118 S.Ct. 1989, 1996-99 (1998)].

Gant, 195 F.3d at 141.

While, in limited circumstances, what school administrators "should have known" can lead to an inference of deliberate indifference, see id. ("[A] showing that the defendant 'should have known' can, in some circumstances, create an inference--at least sufficient to raise a genuine issue--that the defendant did know."); Zamora,414 F. Supp. 2d  418, 424 (S.D.N.Y. 2006)(In some cases  "the deliberate indifference analysis and actual knowledge analysis may be inextricably intertwined, particularly in cases such as Gant ... in which the evidence that a defendant *should* have known might create an inference that it *did* know.")(emphasis in original), this is not such a case. Although school officials "should have known" that J.P. had a history of racially offensive conduct and that some students used racial epithets in the school, there are no facts from which a reasonable fact finder could conclude that any of Defendants "did know" that Plaintiff was being subjected to a racially hostile educational environment by J.P. or by anyone else.  As indicated above, J.P.'s involvement with Plaintiff up to October 29, 2003 was limited to two statements shouted from a car made a year apart, and, to the extent these events involved Plaintiff, they appeared merely tangential

to the rift between J.P. and A.D. See McCann Aff. ¶ 6 [dkt. # 86].

Further, up to October 29, 2003, Plaintiff appeared more than willing to report any incidents of racial harassment to which he was subjected, and school officials investigated all allegations concerning Plaintiff and J.P.  Plaintiff had reported prior incidents to school officials, he was aware of the reporting procedures, and he has admitted that Defendants never refused to communicate with him while he was a student at GHS. See Def. SOMF ¶ 28.  No reasonable fact finder could draw the inference that simply because Defendants did not discipline J.P. for the 2003 Homecoming Dance incident they intended to allow the harassment to continue.  Moreover, up to this date there was little evidence available to school officials that J.P. was directing this racial animosity at Plaintiff as opposed to A.D.  On September 29, 2003, when it became clear that J.P. was directing his racial epithets at Plaintiff, *Plaintiff* chose not to report the conduct.   Plaintiff affirmatively decided not to make a report and instead planned a physical attack on J.P.   To hold any of the individual defendants responsible for actions beyond September 29, 2003 under these circumstances would impose a standard requiring clairvoyance on the part of school officials.  Because that is not the standard, and because there is no evidence upon which a reasonable fact finder could conclude that the individual defendants were deliberately indifferent based upon a "should have known" theory, the hostile educational environment claims against the individual defendants are dismissed. See Yap, 303 F. Supp. 2d at 295.[8]

---

[8] The instant case is similar to Yap in which the Eastern District of New York concluded:

The circumstances of this case, as established by the undisputed facts, would permit no reasonable trier of fact to [drawn an inference of deliberate indifference].  To the contrary, the proffered facts detail a situation where a school district doggedly but unsuccessfully attempted to address serious allegations of racial name-calling and  physical abuse.  The ultimate failure of the District's punitive and preventative measures do not alter the fact that, in light of all of the attendant circumstances, the

(continued...)

### (b) Hostile Educational Environment Claim Against the School District

_____The Court turns next to the claim asserting that the "defendants" had a custom, policy, or practice of not taking "necessary and appropriate measures to protect students of color" from "racial attacks and assaults" resulting in a "hostile environment."  Compl. ¶¶ 35, 26. The Court interprets this claim to be a single claim asserted collectively against the Guilderland Central School District, Guilderland High School, the Guilderland Board of Education, and the individual defendants in their official capacities.  See Kentucky v. Graham, 473 U.S. 159, 165 (1985) (noting that, in a § 1983 action, a suit against individuals in their "official capacity" is effectively a suit against the entity to which they belong);  Booker v. Board of Educ., Baldwinsville Central, 238 F. Supp.2d 469, 474-475 (N.D.N.Y. 2002)(Munson, S.J.).[9]

        In the previous decision in this case, the Court questioned whether Plaintiff could bring a

---

[8](...continued)

actions taken were reasonable attempts to address the reported problems.  Similarly, the failure of Defendants to break their indisputedly long-standing policies regarding transfers and class-acceleration were not unreasonable in light of the proffered information.  In short, the proffered facts, even when drawing all inferences in Plaintiffs' favor, do not permit a reasonable trier of fact to conclude that Defendants exhibited deliberate indifference.  For this reason, summary judgment is appropriate with regard to Plaintiffs' Equal Protection claims.

[9] As Judge Munson stated Booker:

Plaintiffs have also made claims asserting violations of 42 U.S.C. § 1983 and § 1981.  A party who has a cause of action based on § 1983 may sue a "person" who, acting under color of state statute, custom or policy violates the individual's constitutional rights.  Local governments may be sued directly under § 1983 where the alleged unconstitutional action is part of an official policy or custom of a government agency Monell v. Department of Social Services of the City of New York, 436 U.S. 658, 98 S.Ct. 2018, 2035, 56 L.Ed.2d 611 (1978).  For a municipality to be liable for the actions of its employees or agents, they must be executing a governmental policy or custom, "whether made by its lawmakers or those whose edicts or acts are fairly said to represent official policy." Id. at 694, 98 S.Ct. at 2027.  For purposes of § 1983, school districts are considered to be local governments and are subject to similar liability as local governments under Monell. Id. at 696-97, 98 S.Ct. at 2039. . . . The real party in interest in an official capacity suit is the governmental entity and not the named official.  In this case, because plaintiffs bring only official capacity claims against the individual defendants and a Monell type claim against the District, they are redundant to the the claims against the District, and the court dismisses plaintiffs' official capacity claims against the individual defendants.

Section 1983 claim for a hostile educational environment against the School District in light of Title

VI of the Civil Rights Act of 1968, 42 U.S.C. § 2000d ("Title VI") and the Sea Clammers doctrine.

See Barmore, 419 F. Supp. 2d at 199, fn. 3; see also Middlesex County Sewerage Authority v.

National Sea Clammers Assoc., 453 U.S. 1 (1981) ("When the remedial devices provided in a

particular Act are sufficiently comprehensive, they may suffice to demonstrate congressional intent to

preclude the remedy of suits under § 1983."); Bruneau v. South Kortright Central School District,

163 F.3d 749, 756 (2d Cir. 1998)(Applying the Sea Clammers doctrine, the Circuit prohibited an

Equal Protection Clause claim against a school district because "Title IX contains a sufficiently

comprehensive enforcement scheme so as to foreclose the use of § 1983 to implement its

provisions."); Bayon v. State Univ. of New York at Buffalo, 2001 WL 135817, at *3 (W.D.N.Y.

Feb.15, 2001) ("Where Congress has established enforcement mechanisms containing remedial

devices that are sufficiently comprehensive, as it has done with Title VI and the ADA, those

enforcement mechanisms may not be bypassed by bringing suit under section 1983."); see also

Bryant v. Independent School Dist. No. I 38 of Garvin County, Ok, 334 F.3d 928, 932-33 (10th Cir.

2003)(addressing a race-based hostile educational environment claim under Title VI where plaintiff

alleged the school fostered a hostile educational environment by not curtailing racially offense

conduct).  Plaintiff has not moved to amend the Complaint to assert a claim pursuant to Title VI, and,

on the present pleading, such a claim would fail because Plaintiff has not asserted that the

Guilderland Central School District is a recipient of federal funds. See  Booker, 238 F. Supp.2d at

474 ("Plaintiffs have not alleged in their amended complaint that the District is a recipient of federal

financial aid.  Plaintiffs, thus, have failed to state a claim for relief under Title VI against the

District.").  Nevertheless,  whether the claim is addressed under Title VI or as a policy, practice or

custom claim under Section 1983, the lack of deliberate indifference by any individual school

official, and therefore the lack of an actionable violation of Plaintiff's constitutional rights, defeats

the claim against the District. See Monell v. Dep't of Soc. Servs., 436 U.S. 658, 690-91 (1978)(to

hold municipality liable as a "person" under § 1983, plaintiffs must show that a policy or practice of

that entity caused the deprivation of their federal rights); City of Los Angeles v. Heller, 475 U.S. 796,

799 (1986)(*per curiam*) ("[T]his was an action for damages, and neither Monell[], nor any other of

our cases authorizes the award of damages against a municipal corporation based on the actions of

one of its officers when in fact the jury has concluded that the officer inflicted no constitutional

harm."); see also Walker v. City of New York, 974 F.2d 293, 296 (2d Cir. 1992), cert. denied, 507

U.S. 961 (1993)("[I]t is only when the municipality itself commits the misdeed, that is, 'when

execution of a government's policy or custom, whether made by its lawmakers or by those whose

edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as

an entity is responsible under § 1983.'")(quoting Monell, 436 U.S. at 690-91); Yap, 303 F. Supp. 2d

at 297 (dismissing a Section 1983 "policy, practice or custom" claim against the school district where

no underlying constitutional violations occurred.).  Therefore, the claims asserting an impermissible

race-based hostile educational environment against the School District, the Board of Education, and

school administrators in their official capacities are dismissed.

### (c) Disparate Treatment

Plaintiff also brings claims contending that he was discriminated against on the basis of his

race in his disciplinary proceeding in violation of his equal protection rights.  The Equal Protection

Clause "is basically a direction that all persons similarly situated should be treated alike." City of

Cleburne v. Cleburne Living Center, 473 U.S. 432, 439 (1985).  In order to prevail on his equal

protection claims, Plaintiff must establish that (1) he was treated differently than others similarly situated, and (2) this differential treatment was motivated by an intent to discriminate on the basis of race, to punish or inhibit the exercise of constitutional rights, or by a malicious or bad faith intent to injure the person. Diesel v. Town of Lewisboro, 232 F.3d 92, 103 (2d Cir. 2000); Lovell v. Comsewogue Sch. Dist., 214 F. Supp.2d 319, 321-22 (E.D.N.Y. 2003).

Plaintiff has provided no basis upon which a jury could conclude that any of the defendants involved in his discipline were motivated by a desire to punish or inhibit his exercise of constitutional rights, or by a malicious or bad faith intent to injure him.  Further, and more importantly, he has failed to establish that he was treated differently than other similarly situated students outside of his protected class.  Plaintiff has conceded that he knows of no student who received less of a suspension than he was issued for a fight in which the opponent received a broken nose.  Def. SOMF ¶ 33.  The undisputed facts reveal that non-African American students at GHS have received lengthier suspensions for conduct that was far less egregious then planning and commencing a fight in which another student received a broken nose.  While a factual question might be raised as to whether the other students who received longer suspension than Plaintiff were similarly situated to Plaintiff, there can be no dispute that J.P., a Caucasian student, received a far more extensive suspension for the October 31, 2003 fight. Both students were involved in the same event in school, and school officials were aware at the time they imposed discipline on the two that Plaintiff planned for and instigated the fight.  The fact that J.P.'s disciplinary history might have warranted an eight month suspension whereas Plaintiff's history warranted only a one month suspension only underscores the need to defer to school officials' decisions in disciplinary proceedings.  Here, based upon the record before the Court, no reasonable fact finder could conclude

that Plaintiff received a disparately harsh suspension compared to similarly situated students outside his protected classification. Therefore, the claim of disparate treatment in the disciplinary proceeding is dismissed.  See Cudjoe v. Indep. Sch. Dist. No. 12,  297 F.3d 1058, 1070 (10th Cir. 2002)("Because [Plaintiff] has failed to show how [her son] was treated differently than students who are not African-American, we find that she has not presented a colorable claim under Title VI.").  For the same reason, any custom, policy or practice claim asserted against the Guilderland Central School District, Guilderland High School, the Guilderland Board of Education, or the individual defendants in their official capacities, is dismissed.

### (d) Due Process Claims

Defendants also move to dismiss any claims that Plaintiff might have brought under the Due Process Clause of the Fourteenth Amendment. Plaintiff has failed to oppose the motion in this regard. As indicated in this case on the previous motion, "the failure to oppose a motion to dismiss a claim is deemed abandonment of the claim, and, in the Northern District of New York, is deemed consent to granting that portion of the motion."  See Barmore, 419 F. Supp. 2d at 201-02 (citations omitted). Plaintiff's failure to oppose this portion of the is ample reason to dismiss any such claims.

Further, Plaintiff has failed to define the nature or contours of these claims. He has failed to identify any process or liberty interest he was denied sufficient to establish an actionable due process claim.  See id. at 204  ("While the availability of pre- or post-deprivation remedies may be pertinent to a procedural due process analysis, Plaintiff does not appear to be asserting that he was denied procedural due process but rather that his right to free from race-based discrimination in school decisions was violated by Defendants during the process afforded by state law."); Santucci v. Newark Valley Cent. Sch. Dist., 2005 WL 2739104, at *2-*6 (N.D.N.Y. Oct. 25, 2005)(McAvoy,

S.J.)(dismissing a substantive due process claim brought by a student against a school district in similar circumstances); Yap, 303 F. Supp. 2d at 295-96 (dismissing a substantive due process claim brought by a student against a school in similar circumstances). Hence, given Plaintiff's failure to oppose the claims or even identify the contours of the claim, any due process claims are dismissed.

**(e) Negligence Claims**

Finally, Defendants argue that Plaintiff's state law negligent failure to supervise claims must be dismissed because: (1) defendants did not have notice that Plaintiff was going to attack J.P. and, therefore, Defendants had no duty to protect Plaintiff from J.P.; and (2) even if such duty existed, the fight was a sudden, unprovoked act that Defendants could not have prevented and, therefore, Plaintiff cannot establish proximate cause between any lack of supervision and his injuries.

"It is well settled that schools are under a duty to adequately supervise the students in their charge and they will be held liable for foreseeable injuries proximately related to the absence of adequate supervision." Doe ex rel. Doe v. Bd. of Ed, Morris Cent. School, 9 A.D.3d 588, 589 (3rd Dept. 2004)(quotation marks and citations omitted). In order to make out a viable negligent "supervision of other students" claim, Plaintiff must demonstrate that the school failed to exercise the degree of reasonable care that a parent of ordinary prudence would have exercised under comparable circumstances. Farrukh v. Board of Ed. Of City of NY, 227 A.D.2d 440, 441 (2nd Dep't 1996). Proper supervision depends largely on the circumstances attending the event or situation at hand. Where the underlying injury is caused by the intentional act of a fellow student, the "plaintiff [must] demonstrate, by the school's prior knowledge or notice of the dangerous conduct which caused the injury, that the acts of the fellow student[ ] could have reasonably been anticipated." Druba v East Greenbush Cent. School Dist., 289 AD2d 767, 768 (3rd Dept. 2001). As the New York

State Supreme Court, Appellate Division, Third Department recently held:

> The foreseeability of one student intentionally harming another generally requires proof of "[a]ctual or constructive notice to the school of prior similar conduct ... because, obviously, school personnel cannot reasonably be expected to guard against all of the sudden, spontaneous acts that take place among students daily."  And, the test for causation is "whether under all the circumstances the chain of events that followed the negligent act or omission was a normal or foreseeable consequence of the situation created by the school's negligence."

Wood v. Watervliet City Sch. Dist., 815 N.Y.S. 2d 360, 361 (3rd Dept. 2006)(quoting Mirand v. City of New York, 84 N.Y.2d 44, 49-50 (1994))(additional citations omitted).

While "[t]hese issues - the adequacy of supervision and proximate cause - are generally factual questions for the jury," id. at 362, that is not always the case.  In cases alleging liability stemming from the violent act of one student toward another, "New York courts have not hesitated to grant summary judgment to school districts . . .  where the district makes a prima facie showing of a lack of notice and/or proximate cause and plaintiff fails to come forward with factual evidence to the contrary."  Smith v. Half Hollow Hills Cent. Sch. Dist., 349 F. Supp. 2d 521, 525 (E.D.N.Y. 2004); see also Van Leuvan v. Rondout Cent. Sch. Dist., 20 A.D. 3d 645 (3rd Dept. 2005)(affirming grant of summary judgment to school district);  Taylor v. Dunkirk City Sch. Dist., 12 A.D. 3d 1114 (4th Dept. 2004)(reversing denial of summary judgment);  Nocilla v. Middle Country Cent. Sch. Dist., 302 A.D.2d 573, 757 N.Y.S.2d 300 (2nd Dept. 2003)(reversing denial of a school district's motion for summary judgment); Sanzo v. Solvay Union Free Sch. Dist., 299 A.D.2d 878 (4th Dept. 2002)(reversing denial of summary judgment); Valez v. Freeport Union Free Sch. Dist., 292 A.D.2d 595 (2nd Dept. 2002)(reversing denial of summary judgment); Collins v. Studder, 299 A.D.2d 386 (2nd Dept. 2002)(affirming grant of summary judgment) ; Nossoughi v. Ramapo Cent. Sch. Dist., 287 A.D.2d 444 (2nd Dept. 2001)(reversing denial of summary judgment).

25

On the issue of breach of the duty to supervise,  "[a]n injury caused by the impulsive, unanticipated act of a fellow student ordinarily will not give rise to a finding of negligence absent proof of prior conduct that would have put a reasonable person on notice to protect against the injury-causing act." Valez, 292 A.D.2d at 596 (citing  Mirand, 84 NY2d at 49). "As . . .  New York cases make clear, prior, unrelated incidents resulting in discipline are insufficient to put a school on notice of a specific threat of danger requiring supervision." Smith, 349 F. Supp. 2d at 525.

Regarding the fight that took place between Plaintiff and J.P., there was no actual or constructive notice of prior similar conduct sufficient to sustain the negligent lack of supervision claim.  Up to October 31, 2003, the information known to school officials indicated, at most, that J.P. had uttered racially offensive epithets to Plaintiff.  There is no evidence suggesting that J.P. had physically threatened Plaintiff, see fn. 7, *supra*, and there certainly existed no information known to school officials from which a reasonable trier of fact could conclude that the dispute between Plaintiff and J.P. had reached such a fever pitch that *Plaintiff* would decide to ambush J.P. on school grounds.  Thus, on this record, summary judgment is warranted on this claim for lack of evidence of prior notice demonstrating an actionable breach of the duty to supervise. See Taylor (fellow student's prior disruptive behavior toward teacher and verbally aggressive behavior toward plaintiff insufficient to present question of fact regarding breach of duty to supervise); Sanzo, 299 A.D.2d at 878 ("Although the principal of the high school was aware of verbal taunting between plaintiff and [the assailant], there was no proof that either student previously had engaged in violent or threatening behavior that would or should have forewarned the School District of the assault.")(interior quotation marks and citations omitted); Valez, 292 A.D.2d at 296 (Reversing denial of summary judgment where "appellants sustained their burden of establishing that they had no actual or constructive notice

of any prior similar conduct by the student who allegedly assaulted the infant plaintiff. While the codefendant student was previously disciplined for fighting, that single incident was remote and of a dissimilar nature, and did not place school personnel on notice of the instant situation."); Nossoughi, 287 A.D.2d at 444-45 ("Contrary to the plaintiff's contentions, it does not appear that the District had knowledge of any prior, similar incidents. Although the plaintiff submitted evidence of previous trespassing incidents by former students after school hours, none involved physical violence against students resulting in personal injuries.")(citations omitted); Morman v. Ossining Union Free Sch. Dist., 297 A.D.2d 788, 747 N.Y.S.2d 586, 587 (2d Dept. 2002)(Finding lack of adequate notice of the alleged attacker's violent propensities despite the fact that the assaulter had an "extensive disciplinary record" because most of the incidents in the record involved only acts of insubordinate behavior of a non-violent nature.)

Further, Plaintiff's action in quickly and stealthily escalating the dispute between himself and J.P. from one of words to one of blows defeats any proximate cause arising from the District's alleged lack of supervision.  Here, as in Valez, "there is no evidence to suggest that [the school or school official's] purported negligence was a proximate cause of the injuries. The ... assault occurred so quickly that it could not have been prevented by more intense supervision." Valez, 292 A.D.2d at 296; see Smith 349 F. Supp. 2d at  528 ("The incident forming the basis for this complaint took place in a crowded cafeteria during a time period of no more than thirty seconds.  The sudden and unprovoked nature of the attack makes it impossible to establish proximate cause between any lack of supervision and the attack.");  Nocilla, 757 N.Y.S.2d at 302 (The "sudden, unprovoked nature of the attack, as well as its short duration" established that the attack would have occurred "regardless of

the District's level of supervision. . . ."); <u>Nossoughi</u>, 287 A.D.2d at 445;[10] <u>see also</u> <u>Van Leuvan</u>, 20 A.D. 3d at 646 ("[E]ven assuming that defendant had the requisite knowledge or notice, the kick occurred so suddenly that no amount of supervision would have prevented it and, therefore, any purported negligence based on lack of supervision was not a proximate cause of [plaintiff's] injuries."). Thus, summary judgment on this claim is warranted for lack of evidence that would satisfy the element of proximate cause.

## V.  CONCLUSION

For the reasons set forth above, Defendants' motion for summary judgment is **GRANTED** in all respects, and the action is **DISMISSED**.

**IT IS SO ORDERED**

**DATED:  July 12, 2006**

Thomas J. McAvoy
Senior, U.S. District Judge

---

[10] In <u>Nossoughi</u>, the New York Supreme Court Appellate Division, Second Department,  held:

> Moreover, the plaintiff failed to raise a triable issue of fact as to whether the defendant's conduct was a proximate cause of his injuries. The criminal attack by the assailant was an intervening and unforeseeable act which broke any causal nexus between the alleged negligence of the District and the injuries sustained by the plaintiff. The plaintiff testified that the assault occurred spontaneously, with the entire incident taking less than one minute.  Since the manner in which the injury occurred could have happened even if the hallway had been supervised, summary judgment should have been granted to the defendant.

287 A.D.2d at 445 (citations omitted).